UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CASPER SABATINO | CASE NO.: 3:02 CR 378 (AHN)<br><br>January 18, 2007 |

**SENTENCING MEMORANDUM OF CASPER SABATINO**

Edward J. Dauber (ct24588)
GREENBERG DAUBER EPSTEIN & TUCKER
A Professional Corporation
One Gateway Center, Suite 600
Newark, NJ 07102-5311
(973) 643-3700

-and-

John F. Droney (ct10906)
David A. DeBassio (ct24365)
Jeffrey A. Mirman (ct05433)
LEVY & DRONEY, P.C.
74 Batterson Park Road
Farmington, CT 06032
(860) 676-3000

Attorneys for Casper Sabatino

**Preliminary Statement**

This Memorandum is submitted on behalf of Casper Sabatino, who is scheduled to be sentenced by Your Honor on January 29, 2007 at 2 p.m.

On April 9, 1998, Mr. Sabatino, who was employed by the recently created Cendant Corp. in Stamford, Connecticut, got into his car along with Steven Speaks and drove to Parsippany, New Jersey to blow the whistle on what was then the largest corporate fraud in U.S. history. Thus ended for Mr. Sabatino years of difficulty during which, pursuant to orders of his superiors, he aided and abetted that fraud, fearing that to do otherwise would jeopardize his livelihood and the only career that he knew. Thus also began for Mr. Sabatino what has turned out to be more than eight years of cooperation with the United States Government in what has been its successful effort in prosecuting the designers and directors of the fraudulent scheme. During these eight years, Mr. Sabatino and his wife, Joan, have been under the constant stress of not knowing what the future holds for them and of having their lives in limbo.

The Government, in the § 5K1.1 letter being submitted to the Court, as well as in the Stipulations entered into with Mr. Sabatino in his plea agreement on June 18, 1999, has recognized the truly extraordinary nature of Mr. Sabatino's cooperation, as well as the fact that Mr. Sabatino obtained no personal pecuniary gain from the scheme. Mr. Sabatino was the very first person to accept responsibility in connection with this fraud, and he did so at the outset without any assurance of what the consequences would be for him personally. We hope that the Court, after reviewing the Government's letter and all of the information presented here, will conclude that Mr. Sabatino has substantially already paid his debt to society and that Your Honor will find a probationary sentence an appropriate disposition of the charge to which he has pled guilty.

## Mr. Sabatino's Employment and His Blowing of the Whistle

Mr. Sabatino joined the Comp-U-Card International Company in 1985 as manager of financial reporting. Comp-U-Card eventually became CUC International which, in 1997, merged with HFS to become Cendant. At the time that Mr. Sabatino's employment with the Company ended, he was vice-president of accounting. He was not a CPA.

When Mr. Sabatino first joined the Company, it was a young, energetic business that was growing very rapidly. As time progressed, the Company became quite large and, from Mr. Sabatino's perspective, the internal growth of its core business and products was slowing down. Mr. Sabatino and others in financial reporting were told to make some suspect entries, the justification of which, he was told initially, was to compensate for estimates made at the subsidiary level. As time went on, it became clear that the adjustments being directed were without merit and they became more and more blatant. Over a several year period, Mr. Sabatino was instructed to change numbers on the quarterly consolidations ("topside adjustments") on many occasions and he and his group did so.

To Mr. Sabatino, the financial reporting aspect[1] of his job troubled him greatly. He thought about doing something to stop this conduct before it grew further. He was afraid, however, that senior management was involved and that if he went to them, or even to the Company's audit committee, they would disregard him, relegate him to minor duties, and eventually dismiss him. Fearing loss of employment and his career, and working in a culture in which being a "good employee" involved engaging in this activity, Mr. Sabatino was not able to bring himself to expose the fraud while he was still directly reporting to those who were responsible for it.

---

[1] Within his department were also tax and fiscal services.

2

As Mr. Sabatino testified on October 24, 2006, in the trial of Walter A. Forbes, in response to the Government's questioning:

> Q. Mr. Sabatino, can you tell the jury why you decided rather than going right up the block, right – Mr. Forbes was just up the block from your office, wasn't he?
>
> A. Yes, he was.
>
> Q. Two minutes away?
>
> A. Less
>
> Q. You could have walked there if you wanted to?
>
> A. I did on many occasions.
>
> Q. Instead of going and walking down the street and telling Mr. Forbes, you got in your car and drove to Parsippany, New Jersey?
>
> A. Yes.
>
> Q. How far away is that?
>
> A. About an hour away.
>
> Q. So you decided to drive an hour away and go down to Parsippany. Can you tell the jury why?
>
> A. Well, in the past I thought about it, and I felt that if I had gone to, for example, the board of directors of the former CUC, it somehow would have been squashed, and I would have eventually lost my job. I figured that Mr. Monaco and Mr. Scott Forbes were now going

>to be the senior financial people at new Cendant and they should have a right to know.

>Tr. at 2944:14-2945:12.

As this testimony reflects, once the merger with HFS occurred and Mr. Sabatino would now be reporting to its executives, he decided to act. He and Mary Sattler (an employee in his office) prepared a schedule summarizing the unsupported topside adjustments. Steve Speaks, at the Comp-U-Card division, supplied them with the adjustments or reserve take downs that were made on the Comp-U-Card books. They then went to the headquarters of HFS in Parsippany and exposed the fraud. Tr. 2940:22-2941:10.

Assistant U.S. Attorney Carpenito had Mr. Sabatino summarize what happened in the following colloquy on October 24, 2006 at the Forbes trial:

>Q. What did you do with those schedules that day, where did you go?
>
>A. The next day, Steve Speaks, Mary Sattler and myself went to Parsippany, New Jersey, headquarters of HFS.
>
>Q. Why did you go to Parsippany, New Jersey, that day?
>
>A. We went there to show and explain the schedule that we had prepared the night before.
>
>Q. And you exposed to Parsippany, New Jersey, the office of the former HFS businesses, your involvement in the fraud at CUC?
>
>A. That's correct.
>
>Q. You were a whistle blower?

4

>   A.   Yes.
>
>   Q.   And who was with you when you went down to Parsippany to tell them about your fraudulent activities?
>
>   A.   Steve Speaks and Mary Sattler.

Tr. 2941:6-24.

A few days later, without any assurance as to what the consequence would be for him and without even consulting counsel, Mr. Sabatino again voluntarily met with the Company and provided a sworn Affidavit, in which he attested, among other things, to topside adjustments, unsupported merger reserve reductions, reclassified revenues, and the unwarranted targeting of earnings figures.

As a result of the revelations of Mr. Sabatino and his co-workers, Cendant engaged the law firm of Wilkie Farr & Gallagher to serve as counsel to its Audit Committee. On April 15, 1998, only 6 days after Mr. Sabatino had first exposed the scheme, he had an extensive meeting with the Wilkie counsel and provided them with substantial information that resulted in a twenty-page initial memorandum. By the time of the Audit Committee's second interview of Mr. Sabatino on July 31, 1998, he was already well into his cooperation with the United States Government. Mr. Sabatino also continued to cooperate with the Audit Committee. He met for months with the forensic accountants that they hired in order to educate them and guide them in terms of explaining which entries were legitimate and which were without merit. He also engaged in a similar process with the Company's accounting firm, Deloitte & Touche, in restating financial results for the fraudulent periods.

### Mr. Sabatino's Cooperation with the United States Government

On May 4, 1998, contact was first established between the United States Attorney's Office for the District of New Jersey and Edward J. Dauber, Esq., who had recently been engaged to represent Mr. Sabatino. On May 11, 1998, Mr. Sabatino (with Mr. Dauber) met for the first time with the United States. Attending that first meeting from the Government were two Assistant United States Attorneys (then - AUSA Paul Weissman being the lead) and representatives of the FBI, the Postal Inspection Service, and the Securities and Exchange Commission. The meeting was voluntary on Mr. Sabatino's part, and since the Government was at the incipiency of its investigation, it was not even in a position to delineate Mr. Sabatino's status. Mr. Sabatino received no assurances as to the consequences of his cooperation. At that meeting, Mr. Sabatino began to explain to the Government the nature and extent of the fraud as he knew it and to educate the attorneys and agents as to the accounting mechanisms and methodologies that were used to effectuate the fraud. Over the next six years, Mr. Sabatino had more than thirty meetings with numerous Assistant U.S. Attorneys and Government agents to assist their investigation.

In June, 2004, Mr. Sabatino was called by the Government and testified for six days at the first trial of Walter A. Forbes and E. Kirk Shelton. Mr. Shelton was convicted at that trial. In affirming that conviction, the Second Circuit cited in particular to an incident testified to by Mr. Sabatino, in which Mr. Shelton tore up a document that stated that "reserves are being managed to meet quarterly targets" and Mr. Shelton stated, "I guess I never saw that document." U.S. v. Shelton, No. 05-4342 (2d Cir. 2006). Summary Order, 3-4. Because Mr. Sabatino had no direct evidence with regard to Walter A. Forbes, the Government did not call him on its case in the second and third

trials. However, the defense did call Mr. Sabatino at both trials and the Government therefore also examined him at both trials. The recently-concluded third trial thus afforded Your Honor the opportunity to observe Mr. Sabatino first hand and to assess his demeanor and credibility.

While we have not as yet received the Government's § 5K1.1 submission, we have been told by the United States Attorney's Office that it will be describing Mr. Sabatino's cooperation in exceptional terms, and that it will recognize the fact that were it not for Mr. Sabatino, the fraudulent scheme might not have been uncovered at all or its discovery would certainly have been delayed.

### The Plea Agreement and the SEC Consent

After a year of investigation, although the Government recognized how instrumental Mr. Sabatino had been in exposing the fraud and how reliable his cooperation had been, it felt that given the position he had held as Director of Financial Reporting and his participation in the fraud, his conduct warranted charging him with a criminal offense. As a result, on June 18, 1999, Mr. Sabatino entered into an agreement to plead guilty to a one-count information charging him with aiding and abetting wire fraud, in violation of 18 U.S.C. § 1343.

The plea agreement does not only have the language usually used for cooperators (in terms of the Government agreeing to move pursuant to § 5K1.1 for a downward departure), but it also contains several fairly unusual stipulations, which recognized -- even then -- Mr. Sabatino's unique contribution to the exposure of the fraud and the Government's efforts. Thus, after noting that Mr. Sabatino's clear acceptance of responsibility would entitle him to a 3-point reduction in his offense level under U.S.S.G. §§ 3E1.1(a) and (b) (Stipulations 7 and 8), the Government went on to stipulate (Stipulation 10) as follows:

>10. Mr. Sabatino voluntarily disclosed and caused to be disclosed to authorities the existence of, and accepted responsibility for, the offense to which he has agreed to plead guilty prior to the discovery of such offense. **It is likely that that offense would not otherwise have been discovered for a substantial period of time. Further, it is likely that the full scope of the offense would never otherwise have been established**. See U.S. S.G. § 5K2.6. (Emphasis added)

Furthermore, the Government stipulated (Stipulation 3) that while the fraud caused losses in excess of $80 million,

> taking into account all the circumstances of the case and the nature of Mr. Sabatino's role in the offense, the total loss caused by the wire fraud significantly overstates the seriousness of Mr. Sabatino's conduct, and excessive weight would be attached to this factor by applying the full adjustment indicated under U.S.S.G. § 2F1.1(b)(I).

Indeed, the Government also stipulated (Stipulation 12) that "[t]here is no evidence that Mr. Sabatino engaged in his criminal conduct for personal pecuniary gain." Similarly, the following stipulation (Stipulation 11) was agreed to with regard to the concept of restitution as it applied to Mr. Sabatino:

>11. An order of restitution would be inappropriate in the context of a criminal proceeding against Mr. Sabatino because the number of identifiable victims is so large as to make restitution impracticable and determining complex issues of fact related to the cause or amount of the victims' losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim in the context of a criminal proceeding is outweighed by the burden on the sentencing process.

At the request of the Government, Mr. Sabatino's actual plea was held off until June 14, 2000, at which time he formally pled guilty and officially accepted responsibility before the Hon. William H. Walls in the District of New Jersey. Approximately one week before the plea, Mr.

Sabatino signed a Consent and Undertakings to an SEC Complaint, wherein he agreed to a Final Judgment of Permanent Injunction and Other Relief, which, <u>inter alia</u>, permanently barred him from acting as an officer or director of any public company.

## The Impact of Mr. Sabatino's Cooperation and Plea

The Government will fully describe in its § 5K1.1 letter the extent of Mr. Sabatino's cooperation and the significance of his cooperation and plea for their investigation and the subsequent convictions. We will here only summarize the sequence of events as follows:

> April 9, 1998. Mr. Sabatino blows the whistle in Parsippany.
>
> April 14, 1998. Mr. Sabatino voluntarily signs the Affidavit for the Company.
>
> April 15, 1998. Mr. Sabatino has his first meeting with counsel for the Company's Audit Committee.
>
> May 4, 1998. First contact between Mr. Sabatino's counsel and the Government.
>
> May 11, 1998. First meeting between Mr. Sabatino and the Government.
>
> June 18, 1999. Mr. Sabatino enters into plea agreement.
>
> September 28, 1999. Anne Pember enters into plea agreement.
>
> January 14, 2000. Cosmo Corigliano enters into plea agreement.
>
> June 6, 2000. Casper Sabatino consents to SEC injunction.

9

> June 14, 2000. Casper Sabatino pleads guilty to one count of aiding and abetting wire fraud.
>
> June 14, 2000. Anne Pember pleads guilty to one count of conspiracy to commit mail and wire fraud.
>
> June 14, 2000. Cosmo Corigliano pleads guilty to one count of conspiracy to commit mail and wire fraud and one count of wire fraud.
>
> February 28, 2001. Walter A. Forbes and E. Kirk Shelton are charged in a two count Indictment, which is later superseded by a sixteen count Indictment.
>
> May 6, 2004. Cosmo Corigliano enters into a Consent Judgment with the SEC.
>
> June 2004. Casper Sabatino testifies for six days at the Shelton/Forbes trial.
>
> January 4, 2005. Shelton is convicted on twelve counts.
>
> November 2005. Casper Sabatino testifies at Walter Forbes' second trial.
>
> October 2006. Casper Sabatino testifies at Walter Forbes' third trial.
>
> October 31, 2006. Forbes is convicted on three counts.

As the Government has recognized, Casper Sabatino's cooperation and plea was the initial domino that led to the fall of all the other defendants.

## Casper Sabatino's Personal Background and the Impact of these Events on Casper and Joan Sabatino

Pursuant to 18 U.S.C. § 3553 and <u>United States v. Booker</u>, 543 U.S. 220 (2005), the court is to "impose a sentence sufficient, but not greater than necessary" to meet the sentencing purposes set forth in the statute. In doing so, the Court is to take into account "the nature and circumstances of the offense and the history and characteristics of the defendant."

Having presided over the third Forbes trial and having received numerous other submissions, the Court is familiar with the nature and circumstances of the offense. We would like, however, to acquaint the Court with Mr. Sabatino as a person.

Casper was born on January 26, 1953 in the Bronx, N.Y. and was raised there. His father, Henry, who died in 1995 at the age of 70 of cancer, worked as a baker from the age of 17. His mother, Florence, now age 77, still lives in the Bronx, was a homemaker, and now has various ailments. Casper had a single sibling, Theresa, who tragically died of leukemia in 1989 at the age of 39.

Casper grew up in what he describes as a typical blue collar, Italian, Roman Catholic family. He attended Catholic school for both elementary and high school and describes his upbringing as rather strict. He was taught to respect his elders and to do what he was told. As Casper's wife Joan states in her letter to the Court, attached hereto as Exhibit A:

> Throughout his career, his work ethic has been impeccable. He is extremely conscientious, hard working and dedicated to any job he undertakes, always doing what is asked of him, without question, and obeying his superiors. He has always been willing to invest as much of his time needed to get the job done, even if it involved giving up weekends and vacations. Every job was performed to the best of his ability.

11

Casper met Joan in 1972 and they were married in 1977. They have no children. Joan's letter describes the Casper Sabatino that she knows and the effect that this case has had on him and on them:

> As a family man, Casper is caring, considerate and responsible. Early in his life he experienced great heartache with the death of his sister, and only sibling, at an early age. Leaving behind three young children, he was instrumental in their upbringing and continues to support and guide them in their adult lives. He is dedicated, caring and devoted to both his family and mine. Being the only child, he is the sole care giver to his elderly mother, who relies upon him for all her needs. Whenever necessary, Casper puts everything aside to take care of her, as well as my elderly parents. He also takes a deep interest in the lives of those less fortunate, always donating to charitable organizations. As a lover of animals, Casper volunteers his time to animal shelters whenever needed. As a husband, he is loving and supportive, always putting my needs before his. If I did not feel that his character was exemplary, I would not have remained with him for all these years.
>
> The last eight years have been extremely stressful and fearful for both of us. Casper is very stoic and keeps his feelings hidden. He has become distant and despondent and that's not his personality. I, on the other hand, have become very emotional and am aware of how much pain he is enduring. This has greatly affected me. As an educator of young children, I need to be focused at all times and this has been very difficult. Casper feels terrible remorse for what has happened and I know that his mistake was not made intentionally or out of greed. He was just obeying his superiors the way he was taught. We have tried to move on with our lives but it is difficult since we are fearful of what the future holds for us.
>
> This is just a snapshot of Casper's character, taken by someone who knows him better than anyone. I was not fortunate enough to have children, but I was blessed with a wonderful husband and best friend. Casper is my whole life and I can't imagine life without him.

Casper, himself, in a letter attached hereto as Exhibit B, has also written the Court describing his insights into the situation and the impact that the case has had on him and Joan:

> My life became unhappy not when I blew the whistle on this scheme, but years before when we were directed to make inappropriate entries. This became part of my job and I am very angry at myself for letting that happen. I am extremely remorseful for my participation. I had no intent to harm anyone, although I realize that many people have been harmed. I have tried to do whatever I can to fix what was done, even before I had legal representation.
>
> There is not a day that has gone by over the past eight + years that this dreadful episode is not forefront in my mind. It has taken a very strong negative toll on me and my wife. I have tried in the past to secure another position in the business field, but my efforts have become senseless because of all this. My value in this field is now at zero and my earnings potential is the same. We now survive on the salary of my wife and our savings. We (my wife and I) now own a small retail store, which I personally manage. The financial rewards are practically nothing, but the personal rewards are outstanding. I now feel a sense of accomplishment and have become a well-known well-liked person in the community of my store. I am happy doing this, but I have a daily fear that what has happened in the past can negatively affect our little business; that would be devastating.
>
> My wife has supported me all throughout this entire ordeal, but I can tell it has taken a negative emotional drain on her as well. She is a wonderful, kind, generous person and I know I let her down; I will forever live with that fact.
>
> I know that these problems are my own fault and I have taken responsibility for them as best I could.

While it is obvious that, from Mr. Sabatino's perspective, the dominant impact of this case has been on his self-esteem, self worth, and concern about the effect his misdeeds have had on his wife's opinion of him, there is no doubt that he has also suffered economically, as he mentions in passing. Having been educated as an accountant and having worked as such for 23 years, Mr. Sabatino has been unable to use that skill since termination of his employment by Cendant in 1999. He has managed to find contentment in operating a small retail picture framing store/gallery, but that

venture is essentially break-even. Based on Joan's earnings as a reading teacher in the Brookfield school system and on their remaining savings, the Sabatinos manage to live in a simple life-style.

## Conclusion

Casper Sabatino is a good person, who made a very bad mistake in following his superiors' directives and in going along with a fraudulent scheme. To his credit, once he felt he would be heard, Casper, without any assurances as to his own future, blew the whistle on that scheme. He has tried to make amends as best as he can, by fully cooperating with the investigations that his disclosures launched. That cooperation inexorably led to the prosecution and convictions of Anne Pember, Cosmo Corigliano, Kirk Shelton, and Walter Forbes and the recovery for the investing public of at least some of their losses.

Casper Sabatino lost his job, his career, his self-esteem, and, most importantly, feels a serious impact on the respect that he was held in by the most important person in the world to him -- his wife, Joan. The Government, in its 5K.1.1 letter to the Court, will be describing in extraordinary terms, the extent and significance of Mr. Sabatino's cooperation. Given all that Mr. Sabatino has done to accept responsibility for his offense, to try to redress it, and to assist in bringing others to justice for the last eight plus years, we would respectfully request that the Court impose a sentence of probation. We would also ask the Court to give effect to the parties' Stipulation with respect to

the inappropriateness of an order of restitution with regard to Mr. Sabatino. We thank the Court for your consideration.

                              Respectfully submitted,

                              GREENBERG DAUBER EPSTEIN & TUCKER PC

By: *Edward Dauber*
       Edward J. Dauber (ct24588)
       One Gateway Center, Suite 600
       Newark, NJ 07102-5311
       (973) 643-3700

         -and-

       John F. Droney (ct10906)
       David A. DeBassio (ct24365)
       Jeffrey A. Mirman (ct05433)
       LEVY & DRONEY, P.C.
       74 Batterson Park Road
       Farmington, CT 06032
       (860) 676-3000

       Attorneys for Casper Sabatino

Dated: January 18, 2007